UNITED STATES DISTRICT COURT
DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| LOUISIANA ENVIRONMENTAL ACTION NETWORK, 162 Croydon Ave Baton Rouge, LA 70806-4501 | ) ) ) ) ) | |
| CONCERNED CITIZENS OF LIVINGSTON PARISH, 29787 S. Satsuma Rd. Livingston, LA 70754 | ) ) ) ) ) | **FILED** OCT 1 3 2009 Clerk, U.S. District and Bankruptcy Courts |
| Plaintiffs, | ) ) ) | |
| v. | ) ) ) | **Case: 1:09-cv-01943** **Assigned To : Kennedy, Henry H.** **Assign. Date : 10/13/2009** **Description: Admin. Agency Review** |
| LISA JACKSON, in her Official Capacity as Administrator, U.S. Environmental Protection Agency, Ariel Rios Building 1200 Pennsylvania Avenue, N.W. Washington, DC 20460 | ) ) ) ) ) ) ) | |
| Defendants. | ) ) | |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

### INTRODUCTION

1.     Plaintiffs, Louisiana Environmental Action Network ("LEAN") and Concerned Citizens of Livingston Parish ("Concerned Citizens") bring this citizen suit pursuant to the Clean Air Act § 304(a)(2), 42 U.S.C. § 7604(a)(2), to compel Defendant, Lisa Jackson, in her official capacity as Administrator of the U.S. Environmental Protection Agency ("EPA"), to perform a nondiscretionary act.

2.     Plaintiffs filed a timely petition (the "Petition") with EPA objecting to air permit No.: 1740-00025-V1 (the "Permit") that the Louisiana Department of Environmental Quality

101-093 3

issued to Waste Management for the Woodside Landfill in Walker, Livingston Parish, Louisiana on or about December 5, 2008.

3.     The Clean Air Act requires that EPA grant or deny such petitions within 60 days. 42 U.S.C. §7661d(b)(2). EPA failed to grant or deny Plaintiffs' Petition.

4.     Plaintiffs ask this Court to order EPA to perform its nondiscretionary duty to grant or deny the Petition.

## JURISDICTION

5.     This Court has jurisdiction over the action pursuant to Clean Air Act §304(a). 42 U.S.C. §7604(a) ("[t]he district courts shall have jurisdiction . . . to order the Administrator to perform such act or duty [which is not discretionary]"). This Court also has jurisdiction over the action through its federal question jurisdiction and the Declaratory Judgment Act. *See* 28 U.S.C. §1331 (granting district courts "original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States"); 28 U.S.C. § 2201 (providing that "any court of the United States, upon filing of the appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration...").

## VENUE

6.     Venue is proper in this Court. Pursuant to 28 U.S.C. §1391(e), venue is proper where "the defendant in the action resides, [or] a substantial part of the events or omissions giving rise to the claim occurred...." Specifically, venue is proper here because both EPA Headquarters and the omission giving rise to the claim are located in the District of Columbia.

## NOTICE

7.     Plaintiffs provided notice of their intent to file this lawsuit in a May 1, 2009, Notice of Intent to File Suit to the Administrator of the U.S. Environmental Protection Agency.

101-093 3

Plaintiffs have attached an accurate copy of the Notice of Intent as Exhibit A. The notice complies with §304(b)(2) of the Act, 42 U.S.C. § 7604(b)(2), and 40 C.F.R. pt. 54.

8.     More than 60 days have passed since Plaintiffs provided their May 1, 2009 Notice of Intent to File Suit. EPA has neither granted nor denied the Petition. Upon information and belief, EPA's failure to perform this nondiscretionary duty to grant or deny the Petition will continue until enjoined and restrained by this Court.

**PARTIES**

9.     LEAN is a Louisiana non-profit corporation that fits the definition of "person" under Clean Air Act § 304(a)(2). *See* 42 U.S.C. §7602(e) ("the term 'person' includes... [a] corporation."). LEAN serves as an umbrella organization for several environmental and citizen groups in Louisiana and also has individual members. LEAN has members who live, own property, recreate, and work near the Woodside Landfill. LEAN's purpose is to preserve and protect Louisiana's land, air, water, and other natural resources. LEAN seeks to protect its members from threats of pollution, including harmful emissions such as those from the Woodside Landfill. This lawsuit is germane to LEAN's purpose.

10.     Concerned Citizens is a non-profit corporation that fits the definition of "person" who can bring a citizen suit under Clean Air Act § 304(a)(2). *See* 42 U.S.C. §7602(e) ("the term 'person' includes... [a] corporation."). Concerned Citizens has members who live, own property, recreate, and work near the Woodside Landfill. Concerned Citizens' purpose is to maintain and improve the air and water quality of Livingston Parish. Additionally, Concerned Citizens seeks to protect the health, safety and welfare of the citizens and environment of Livingston Parish. This lawsuit is germane to Concerned Citizens' purpose.

101-093 3

11.    Harold Wayne Breaud is a member of LEAN and Concerned Citizens who lives within one mile of the Woodside Landfill. On several occasions the unmonitored emissions from the Woodside Landfill have forced Mr. Breaud to remain indoors depriving him and his family of enjoying the outdoors on his land. Odors from the Woodside Landfill often seep into Mr. Breaud's home and cause him and his family severe discomfort. For example, Woodside Landfill emissions cause his eyes, nose and throat to burn.

12.    O'Neil Couvillion is a member of LEAN and Concerned Citizens who lives within five miles of the Woodside Landfill. The Woodside Landfill at times emits a strong chemical odor which deprives Mr. Couvillion of the ability to enjoy the outdoors. These emissions cause Mr. Couvillion to cough and sneeze.

13.    The Woodside Landfill releases hazardous and toxic pollutants into the air that Plaintiffs' members breathe. Plaintiffs' members are injured because exposure to these pollutants offends and annoys them, causes them to curtail outdoor activities, and increases their risk of health problems. These injuries are actual, concrete and irreparable and cannot be adequately remedied by money damages.

14.    Plaintiffs' members' injuries are fairly traceable to EPA's failure to take legally required action with respect to the Petition. EPA's failure to grant or deny the Petition injures Plaintiffs' members because it allows the continued operation of the Woodside Landfill under an air permit that a) fails to require the permittee to conduct sufficient emission monitoring to assure compliance, and b) fails to impose the minimum emission requirements that the Clean Air Act mandates for new and modified sources which, like the Woodside Landfill, emit more than 25 tons per year of volatile organic compounds (known as "VOCs") or oxides of nitrogen

4                                        101-093 3

(known as "NOx"). EPA's failure to grant or deny the Petition also injures Plaintiffs by denying them a response to their Petition that the law entitles them to receive.

15.     The Defendant is Lisa Jackson, in her official capacity as EPA Administrator. The Administrator is responsible for directing the activities of EPA and implementing the requirements and mandates of the Act.

## GENERAL ALLEGATIONS

16.     On January 2, 2009, Plaintiffs, pursuant to §505(b)(2) of the Act, submitted the Petition to EPA.

17.     Plaintiffs have attached an accurate copy of the Petition as Exhibit B.

18.     Plaintiffs submitted the Petition to EPA, Louisiana Department of Environmental Quality, and Waste Management within the 60 days after the expiration of EPA's 45 day period for administrative review of the Permit. *See* 42 U.S.C. §7661d(b)(2).

19.     Plaintiffs based the Petition on objections raised with the Louisiana Department of Environmental Quality during the public comment period for the Permit.

20.     The Petition complies with Clean Air Act § 505(b)(2), 42 U.S.C. § 7661d(b)(2).

21.     The Louisiana Department of Environmental Quality issued the Permit on December 5, 2008.

## CAUSE OF ACTION

22.     EPA has a statutory duty to grant or deny the petition by March 3, 2009.

23.     Clean Air Act § 304(a) gives this Court jurisdiction "to order the Administrator to perform such ... duty."

101-093 3

24.     EPA's duty to grant or deny Plaintiffs' Petition is clearly expressed and is ministerial and not discretionary. See 42 U.S.C. §7661d(b)(2) ("The Administrator shall grant or deny such petition within 60 days after this petition is filed.").

25.     EPA has failed to grant or deny Plaintiffs' Petition.

**PRAYER FOR RELIEF**

Plaintiffs respectfully pray that this Court:

A.     Declare that EPA's failure to perform its nondiscretionary duty to grant or deny the Petition within 60 days is a violation of Clean Air Act §505(b), 42 U.S.C. §7661d(b);

B.     Order EPA to grant or deny the Petition within 60 calendar days of this Court's ruling;

C.     Award Plaintiffs the costs of this litigation, including reasonable attorney's fees, pursuant to §304(d) of the Clean Air Act, 42 U.S.C. § 7604(d); and

D.     Grant such other relief as the Court deems just and proper.

Respectfully submitted on October 12, 2009,

Adam Babich (D.C. Bar # 382747)
Tulane Environmental Clinic
6329 Freret St.
New Orleans, LA 70118
Tel. No. (504) 862-8800
Fax No. (504) 862-8721
e-mail: ababich@tulane.edu

*Counsel for Plaintiffs*

Prepared primarily by Shreedhar Patel,
Student Attorney, Tulane Environmental Law
Clinic

101-093 3



**Tulane University**

Tulane Environmental Law Clinic

May 1, 2009

Ref: 101-093.3

<u>*Via Certified Mail No. 7008 1830 0002 8233 3088*</u>
Lisa Jackson, Administrator
U.S. Environmental Protection Agency
Ariel Rios Building
1200 Pennsylvania Avenue, NW
Washington, DC 20460

      Re:    Notice of Intent to File Citizen Enforcement Suit
              <u>Pursuant to Clean Air Act § 304, 42 U.S.C. § 7604</u>

Dear Administrator Jackson:

      EPA has failed to timely respond to a petition filed by the Louisiana Environmental
Action Network, Concerned Citizens of Livingston Parish, Mr. O'Neil Couvillion and Mr.
Harold Wayne Breaud ("Petitioners") on January 2, 2009.  The petition asked the EPA to object
to the preconstruction and initial Part 70 Air Operating Permit (No. 1740-00025-V1) the
Louisiana Department of Environmental Quality issued to Waste Management of LA, LLC for
the Woodside Sanitary Landfill & Recycling Center on December 5, 2008.  EPA has not yet
responded to the petition.  For this reason, the Petitioners respectfully provide this notice that
they will file a lawsuit against you as the EPA administrator, as required by 40 C.F.R. § 54.3.

      Petitioners intend to file a lawsuit to compel you to respond to their petition filed on
January 2, 2009, pursuant to Clean Air Act § 505(b)(2), 42 U.S.C. § 7661d(b)(2).  Under the law,
"the Administrator shall grant or deny such petition within 60 days after the petition is filed."  42
U.S.C. § 7661d(b)(2).  The Administrator had until March 3, 2009 to respond to the petition.
You have failed to do so.  Section 304(a)(2) permits any person to commence a civil action
"against the Administrator where there is alleged a failure of the Administrator to perform and



EXHIBIT
A

Administrator Jackson
Re: Notice of Intent to Sue re: Woodside Landfill Petition to Object
May 1, 2009
Page 2 of 2

act or duty under this Chapter which is not discretionary with the Administrator." 42 U.S.C. §
7604(a)(2).

The full names and addresses of the parties giving this notice are as follows:

Louisiana Environmental Action Network
P.O. Box 66323
Baton Rouge, LA 70896

Concerned Citizens of Livingston Parish
P. O Box 874
Livingston, LA 70754

O'Neil Couvillion
24095 Joe May Road
Denham Springs, LA 70726

Harold Wayne Breaud
16020 Ruth Drive
Walker, LA 70785

Sincerely,

Jill M. Witkowski, La. Bar No. 30121
Deputy Director
Tulane Environmental Law Clinic
6329 Freret Street
New Orleans, Louisiana 70118
Phone: (504) 862-8814
Fax: (504) 862-8721
Email: jwitkows@tulane.edu

Counsel for Louisiana Environmental Action
Network, Concerned Citizens of Livingston Parish,
Mr. Couvillion, and Mr. Breaud

BEFORE THE ADMINISTRATOR
U.S. ENVIRONMENTAL PROTECTION AGENCY

In the Matter of the Preconstruction and Part 70 Air Operating Permit
for Woodside Sanitary Landfill & Recycling Center
Livingston Parish, Louisiana

Permit No.: 1740-00025-V1
Activity No.: PER20070001
LDEQ Agency Interest No.: 11767

Issued to Waste Management of LA LLC
By the Louisiana Department of Environmental Quality

## PETITION REQUESTING THE ADMINISTRATOR OBJECT TO THE PRECONSTRUCTION AND PART 70 OPERATING PERMIT PROPOSED FOR WASTE MANAGEMENT OF LA LLC'S WOODSIDE SANITARY LANDFILL & RECYCLING CENTER

Pursuant to section 505(b) of the Clean Air Act, 42 U.S.C. § 7661d(b)(2) and 40 C.F.R. §

70.8(d), the Louisiana Environmental Action Network, Concerned Citizens of Livingston Parish,

Mr. O'Neil Couvillion and Mr. Harold Wayne Breaud ("Petitioners") petition the Administrator

of the U.S. Environmental Protection Agency ("EPA") to object to the preconstruction and initial

Part 70 Air Operating Permit (No. 1740-00025-V1; "Permit") the Louisiana Department of

Environmental Quality ("LDEQ") issued to Waste Management of LA LLC for the Woodside

Sanitary Landfill & Recycling Center on December 5, 2008.

Petitioners base this petition on comments they filed with LDEQ on March, 2008 during

the public comment period on a proposed modification to Woodside Landfill's air permit—

before it was vacated by the Louisiana courts. Petitioners incorporate by reference to this petition

their public comments, and attach them here as Exhibit A.  Petitioners also based their petition

on comments they would have made if a public comment period had been provided after

Louisiana courts vacated the landfill's air permit and before issuance of a preconstruction and



EXHIBIT

B

tabbies®

initial Part 70 operating permit—as required by law. Petitioners reserve the right to submit additional briefing or other materials in support of their petition as needed.

EPA should object to the Permit because it violates the Clean Air Act because: 1) the Permit fails to include monitoring sufficient to assure compliance with permit limits; 2) the Permit fails to include nonattainment new source review; and 3) LDEQ failed to comply with public notice requirements before issuing the Permit. This Permit represents Waste Management's second attempt to avoid Prevention of Signification Deterioration review, this time by asking LDEQ to lower its emissions limits so it avoids the required review. By lowering the emissions limits without providing a method to ensure that Woodside Landfill is actually complying with the more stringent limitations, LDEQ violated the Clean Air Act when it issued the Permit.

## PROCEDURAL BACKGROUND

LDEQ originally issued a Part 70 permit (No. 1740-00025-V0) for Woodside Landfill on December 17, 2004. Petitioners sued LDEQ for issuing an air permit for Woodside Landfill without performing required Prevention of Significant Deterioration review and for failing to include monitoring sufficient to assure compliance with the permit limits. On August 22, 2007, the Louisiana First Circuit Court of Appeals vacated Woodside Landfill's air permit, finding that LDEQ had issued the permit without the federally mandated Prevention of Significant Deterioration review.[1] Waste Management petitioned for the First Circuit to rehear the case, but it refused. Waste Management then asked the Louisiana Supreme Court to hear the case. This request stopped the permit from being officially vacated until the Supreme Court issued its decision.

---

[1] The court did not address the monitoring issue.

On October 19, 2007, faced with the probability that the court would permanently vacate its air permit, Waste Management asked LDEQ to modify Woodside Landfill's air permit to lower its permit limits so that the landfill would no longer be subject to Prevention of Significant Deterioration review. LDEQ issued public notice and held a hearing on its plan to reopen and modify the existing air permit on March 25, 2008.

On June 18, 2008, before LDEQ modified Woodside Landfill's existing air permit, the Louisiana Supreme Court denied Waste Management's writ application, finalizing the First Circuit's decision to vacate Woodside Landfill's air permit. Without public notice or opportunity to comment, LDEQ issued Waste Management a new "state preconstruction and Part 70 Operating Permit" on December 5, 2008.

Petitioners ask EPA to object to the new preconstruction and Part 70 Operating Permit because LDEQ failed to include monitoring sufficient to assure compliance, failed to perform nonattainment new source review, and failed to follow proper public notice and comment procedures for the Permit.

Petitioners file this petition within sixty days following the end of EPA's 45-day review period as required by Clean Air Act § 505(b)(2), 42 U.S.C. § 7661d(b)(2).[2] The Administrator has sixty days to grant or deny this Petition after it is filed. If the Administrator determines that this permit does not comply with the requirements of the Clean Air Act, he must object to issuance of the permit under Clean Air Act § 505(b)(2), 42 U.S.C. § 7661d(b)(2). Louisiana law also authorizes the Administrator to object to a permit where LDEQ "failed to provide public notice where required pursuant to § 531 [of Louisiana's air quality regulations.]" La. Admin. Code tit. 33 pt. III, §533.D.1.d.

---

[2] *See* EPA Timeline, attached as Exhibit B.

3

## SPECIFIC OBJECTIONS

I.   EPA SHOULD OBJECT TO THE PERMIT BECAUSE THE PERMIT FAILS TO
     INCLUDE MONITORING SUFFICIENT TO ASSURE COMPLIANCE WITH
     PERMIT LIMITS.

The Permit fails to comply with Clean Air Act requirements because it fails into include

monitoring sufficient to assure compliance with permit limits.   The Clean Air Act requires the

all permits include "monitoring ... requirements to assure compliance with the permit terms and

conditions." 42 U.S.C. § 7661c(c).   Federal regulations likewise mandate that "[a]ll ... permits

shall contain ... monitoring ... requirements sufficient to assure compliance with the terms and

conditions of the permit." 40 C.F.R. 70.6(c).

Louisiana's regulations also require that "[e]ach permit issued to a Part 70 source shall

include... compliance certification, testing, monitoring, reporting, and recordkeeping

requirements sufficient to assure compliance with the terms and conditions of the permit...." La.

Admin. Code tit. 33, pt. III § 507.H.1. The law specifies that "Permits shall include... a means

for monitoring the compliance of the source with its emissions limitations, standards, and work

practices." *Id*. § 507.H.5.b.

**A.   *The Permit Fails to Require Monitoring So That Waste Management Can
Demonstrate Compliance with the Permit's Emissions Limits.***

The Permit provides no way for Waste Management to monitor compliance with its

emissions limits, and it is therefore illegal. The Permit sets annual, average pounds per hour, and

maximum pounds per hour emissions limits for the criteria pollutants:  CO, $NO_x$, $PM_{10}$, $SO_2$, and

VOC.   *See* Permit "Emission Rates for Criteria Pollutants."   The Permit also sets annual,

average pounds per hour, and maximum pounds per hour emissions limits for 30 toxic and/or

hazardous air pollutants.   *See* Permit "Emission Rates for TAP/HAP & Other Pollutants."   But

4

the Permit does not require monitoring so that Waste Management can demonstrate whether or not emissions from the Woodside Landfill comply with those emissions limits.

Even though the Permit sets emissions limits for 5 criteria pollutants and 30 toxic and/or hazardous air pollutants that Waste Management can emit from its flare, the Permit does not require Waste Management to gather data to demonstrate its compliance with those limits. Instead, the Permit only requires Waste Management to monitor "the continuous presence of a flame," the "gas flow rate" to the flare, the gauge pressure at the gas collection wells, the temperature of each wellhead, the nitrogen or oxygen concentration in each wellhead, and methane concentrations at the surface of the landfill. *See* Response to Public Comments at 9-10. That monitoring allows Waste Management to show that it is complying with the requirement that it have a gas collection and control system, but not that it is complying with the emissions limits in its permit. For example, none of the required data will allow Waste Management to demonstrate whether it is complying with its Carbon Monoxide permit limit of a maximum of 47.61 pounds per hour from the flare. None of the monitoring the Permit requires allows Waste Management to demonstrate compliance with any of its emissions limits. For this reason, the Administrator must object to the Permit and direct LDEQ to add monitoring so that Waste Management can demonstrate compliance with the emissions limits.

## B. The D.C. Circuit Acknowledged That Permits Must Contain Monitoring to Assure Compliance.

On August 19, 2008, the D.C. Circuit Court of Appeals issued a decision acknowledging the Clean Air Act's "statutory directive that each permit must include adequate monitoring requirements." *See Sierra Club v. EPA*, 536 F.3d 673 (D.C. Cir. 2008). The court overturned EPA's rule prohibiting states from supplementing federally required periodic monitoring in air

5

permits, even if that monitoring was not sufficient to assure compliance with the permit. *See id.* at 673. The Court held that the plain language of the "Clean Air Act *requires* such *supplementation*" of inadequate monitoring requirements. *Id.* at 679 (emphasis added). Ultimately, the court found EPA's rule violated the plain language of the Clean Air Act and affirmed that states must supplement EPA's periodic monitoring where it is not sufficient to assure compliance with the terms and conditions of the permit. *Id.* at 677.

This means that LDEQ may only issue an air permit that includes monitoring sufficient to assure compliance with the Permit's emissions limits. Here, the Permit only requires Waste Management to collect data to show that it is operating its gas collection and flaring system in accordance with the regulations, but does not require Waste Management to collect data to show that it is actually complying with the Permit's emissions limits. To comply with the Clean Air Act, the Administrator must require LDEQ to add monitoring to the Permit so that Waste Management can demonstrate that it is complying with its emissions limits. Specifically, LDEQ must require Waste Management to continuously monitor the composition of the gas entering the flare in order to determine the pollutants exiting the flare and assure compliance with hourly emissions limits.

### C.     *LDEQ Failed To Show How The Permit's Monitoring Will Assure Compliance With Emissions Limits.*

Petitioners commented that the draft modified permit LDEQ noticed for public comment did not contain monitoring sufficient to assure compliance with the permit limits. In response to Petitioners' comment on the draft modified permit, LDEQ failed to explain how the monitoring requirements will assure compliance with the Permit's emissions limits. Instead, LDEQ alleges that "the permit provides for monitoring in accordance with all applicable regulations." Resp. to Pub. Comments at 9. LDEQ then listed the performance standards set forth in the regulations to

ensure the gas collection and flare system are functioning properly. *Id.* LDEQ makes no claim that those gas collection and flare system monitoring requirements assure that Waste Management is complying with the Permit's emissions limits.

Instead, LDEQ relies on an interpretation EPA articulated in 71 Fed. Reg. 75,422 (December 15, 2006)  to claim that 40 C.F.R. § 70.6(c)(1) "does not establish a separate regulatory standard or basis for requiring or authorizing review and enhancement of existing monitoring…." Resp. to Pub. Comments at 10. But it was this very interpretation that the D.C. Circuit vacated in *Sierra Club v. EPA. See* 536 F.3d at 676-7, 678 ("In December 2006, EPA adopted the rule. 71 Fed.Reg. 75,422 (Dec. 15, 2006) ("2006 rule")….We hold, under step one of *Chevron,* that Title V of the Act unambiguously precludes EPA's interpretation in the 2006 rule. Accordingly, we vacate the 2006 rule.").

The court specifically found that, when read in conjunction with the Clean Air Act's mandate that " *[e]ach permit* ... shall set forth ... monitoring ... requirements to assure compliance with the permit terms and conditions,"[3] 40 C.F.R. 70.6(c) requires "that somebody must fix these inadequate monitoring requirements." *Id.* at 678 (emphasis in original). Because LDEQ issued the Permit, it carried the responsibility of supplementing the insufficient monitoring requirements so that they assure compliance with the Permit's emissions limits.

LDEQ acknowledges that it is "aware of" *Sierra Club v. EPA,* but mistakenly argues that it is not a binding decision. *See* Resp. to Pub. Comments at 10. The D.C. Circuit issued the judgment on August 19, 2008 and granted EPA until November 3, 2008 to petition for rehearing or rehearing *en banc. See* Per Curiam Order issued on Oct. 10, 2008. No petition for rehearing or rehearing *en banc* was timely filed, and the D.C. Circuit issued the mandate to EPA on

---

[3] 42 U.S.C. § 7661c(c).

7

November 13, 2008, making the D.C. Circuit's judgment final and binding. EPA's time to petition for a writ of certiorari to the Supreme Court has likewise expired. The Supreme Court rules give a party 90 days from issuance of the *judgment* to file for a writ of certiorari, unless the party timely petitions for rehearing or rehearing *en banc*. Sup. Ct. R. 13. Because EPA did not timely petition for rehearing or rehearing en banc, its time to file a writ expired on November 17, 2008. *Sierra Club v. EPA* is therefore binding authority requiring LDEQ to supplement federal monitoring requirements to "assure compliance" with the Permit's emissions limits.

> D.    ***Because LDEQ Failed To Require Monitoring Sufficient To Assure Compliance With The Old Emissions Limits, the New Emissions Limits are Arbitrary and Capricious and Not Based On Sound Evidence.***

LDEQ has never required Waste Management to monitor the landfill gas composition so that it could determine emissions from its flare, even though Waste Management has been operating the flare since 2003. Because LDEQ never required Waste Management to conduct monitoring sufficient to assure compliance with the emissions limits for Woodside Landfill, Waste Management does not have data demonstrating how much pollution it has been emitting from its flare over the past several years or to justify reducing its emissions limits. *See* 40 C.F.R. § 70.6(c)

LDEQ admits that "[n]either LDEQ nor Waste Management claims an emission reduction is associated with the revised Part 70 permit." Resp. to Pub. Comments at 7. Yet the Permit claims that the landfill is emitting nearly **400** fewer tons per year of carbon monoxide than it had originally estimated. *See* Basis for Decision at 4. Waste Management has no emissions data to support this reduction in emissions limits—because LDEQ never required monitoring sufficient to assure compliance with the original emissions limits. Instead, Waste

8

Management used "results obtained by C-K Associates in 2000 [and]... EPA (AP-42)... to calculate potential emissions." Resp. to Pub. Comments at 7.

Louisiana has specific regulations that address modifying a permit to accommodate test results. *See* La. Admin. Code tit. 33 pt. III § 523. A facility owner or operator "shall request a permit amendment or modification to reflect the results of any testing required or approved by the permitting authority, if such testing demonstrates that the terms and conditions of the existing permit are inappropriate or inaccurate." *Id.* § 523.A. This means that Louisiana regulations contemplate reopening a permit to accommodate test results that indicate that emissions limitations based on the potential to emit were either too high or too low. The regulations provided that such request "shall be submitted within 45 days of obtaining the relevant test results." *Id.* Here, Waste Management attempts to rely on AP-42 factors from 1998 and test results from 2000—8 years ago and 4 years before the old permit was issued—to attempt to justify the emissions reduction. *See* Resp. to Pub. Comments at 7 ("March 2004 testing measured the concentrations of the related compounds in the landfill gas.... More accurate test results obtained by C-K Associates in 2000 or provided by EPA (AP-42) are used to calculate potential emissions....").

EPA recognizes that the AP-42 factors it provides are not appropriate to establish source-specific permit limits. *See* Introduction to AP-42, Vol. 1, 5th ed. at 2, *available at* http://www.epa.gov/ttn/chief/ap42/c00s00.pdf ("Use of these factors as source-specific permit limits and/or as emission regulation compliance determinations is not recommended by EPA."). Because the AP-42 emissions "essentially represent an average of a range of emissions rates, approximately half of the subject sources will have emission rates greater than the emission factor and the other half will have rates less than the factor." *Id.* EPA recommends that facilities

9

use "source-specific tests or continuous emissions monitors [to] determine the actual pollutant contribution from an existing source" because such tests can determine emissions "better than can emissions factors." Introduction to AP-42 at 3. EPA also recommends using emissions information from equipment vendors "[i]f representative source-specific data *cannot* be obtained...." *Id.* (emphasis added).

LDEQ has not determined that source-specific data cannot be obtained. On the contrary, Waste Management ran tests in 2000 and 2004 to determine the constituents of the landfill gas. LDEQ has not explained why it refuses to require Waste Management to perform those tests on a regular basis to assure compliance with the emissions limits or to require Waste Management to install a continuous monitoring device to determine emissions from the flare system. Not only does the Permit fail to include monitoring sufficient to assure compliance with the Permit's emissions limits, but those emissions limits are arbitrary and not supported by substantial evidence.

Further, the emissions limits are *maximum* amount of pollution that the Woodside Landfill is allowed to emit. Any facility may, and is encouraged to, emit fewer pollutants than it is permitted to emit. Why then would Waste Management ask for a lower emissions limit? And why would it ask to lower the limit based on test results that are 8 years old?   At the time it applied for a modified permit, Waste Management was faced with the potential that Louisiana's courts would vacate Woodside Landfill's air permit because LDEQ had inappropriately waived Prevention of Significant Deterioration review.  Instead of actually doing the court-ordered PREVENTION OF SIGNIFICANT DETERIORATION review, Waste Management essentially asked LDEQ to once again waive PREVENTION OF SIGNIFICANT DETERIORATION review by lowering the Woodside Landfill's emissions limits without testing results justifying

10

that reduction.   And Waste Management will not even have to comply with the lowered emissions limits because the Permit does not contain monitoring to assure compliance with the Permit's emissions limits.

This is the very situation that the regulations were designed to avoid—a facility suddenly claiming—with no data to support the claim—that it is emitting fewer pollutants in order to avoid court-ordered PREVENTION OF SIGNIFICANT DETERIORATION review.  Petitioners welcome an actual emission reduction at the landfill, but they protest the Permit because it merely allows Waste Management to avoid PREVENTION OF SIGNIFICANT DETERIORATION review.  Further, because the Permit fails to include monitoring to assure compliance with the reduced permit limits, neither the Petitioners, nor LDEQ, nor Waste Management has any way of determining whether Woodside Landfill's emissions comply with the lowered limits.

II.     EPA SHOULD OBJECT TO THE PERMIT BECAUSE THE PERMIT FAILS TO INCLUDE NONATTAINMENT NEW SOURCE REVIEW.

Woodside Landfill emits over 25 tons per year of each of $NO_x$ and VOC and is located in Livingston Parish, which has never been classified as attainment for ozone.  Woodside Landfill is therefore a major stationary source subject to nonattainment new source review and offset requirements before LDEQ can issue it a preconstruction and initial Part 70 Operating Permit.

A.     *Woodside Landfill is A Major Source Subject to Nonattainment New Source Review.*

EPA "bumped up" the Baton Rouge ozone nonattainment area, which includes Livingston Parish,  to a "severe" nonattainment in April 2003.[4]   In 2005, EPA replaced the 1-

---

[4] 68 Fed. Reg. 20,077 (April 24, 2003).

hour ozone standard with a revised 8-hour version.[5] To implement the revised standard, EPA has

adopted classifications and deadlines for nonattainment areas, including Baton Rouge,[6] that

differ from those that applied under the 1-hour standard.[7] But because the polluted air in these

areas continues to threaten public health, the pollution control requirements that applied when

EPA classified the areas as "severe" must remain in effect.  Under the Clean Air Act's anti-

backsliding policy, EPA and the state must implement Congress' ozone control mandates until

the Baton Rouge area finally attains the ozone health protection standard, however EPA may

define that standard at the time. *See* Clean Air Act § 172(e), 42 U.S.C. § 7502.  In other words,

"[t]he Act placed states onto a one-way street whose only outlet is attainment" and protection of

public health.[8]

Livingston Parish is still not in attainment for ozone, more than 18 years after Congress

re-structured the Clean Air Act such that *any* area that fails to meet the health-protection

standard for ozone pollution "9 years" after November 15, 1990, must be classified as a "severe"

non-attainment area.[9]  Under the Clean Air Act's anti-backsliding protections, the protections

that apply in "severe" non-attainment areas still apply in Livingston Parish.  Therefore,  a "major

source" in Livingston Parish is one that emits 25 tons per year or more of $NO_x$ or VOC.[10]  In

---

[5] 69 Fed. Reg. 23,951, 23,954 (Apr. 30, 2004) ("We will revoke the 1-hour standard in full, including the associated designations and classifications, 1 year following the effective date of the designations for the 8-hour NAAQS.").

[6] 73 Fed. Reg. 15,087, 15087 (Mar. 21, 2008) ("By operation of law, the Baton Rouge area is to be reclassified from a "marginal" to a "moderate" *8-hour* ozone nonattainment area on the effective date of this rule") (emphasis added).

[7] See Clean Air Act § 181(a)(1), tbl. 1, 42 U.S.C. § 7511(a)(1), tbl. 1.

[8] South Coast Air Quality Management Dist. v. EPA, *v. EPA*, 472 F.3d 882, 900 (D.C. Cir. 2006).

[9] 42 U.S.C. § 7511(a)(1), tbl 1. The only exceptions to this principle are very narrow and do not apply to the Baton Rouge area. *See id.* § 7511(a)(5) (providing limited authority for one year extensions).

[10] 42 U.S.C. §§ 7511a(d) (setting the major source threshold at 25 tons per year for "severe" areas); *see also id.* § 7511a(c) (setting the major source threshold at 50 tons per year for "serious" areas).

addition, the Clean Air Act requires an emissions offset ratio of 1.3 tons of reductions for each 1 ton of new emissions from major sources in Livingston Parish.[11]

According to the Permit, Woodside Landfill emits 65.32 tons per year of $NO_x$ and 34.27 tons per year of VOC. Therefore, the landfill is a major source for both $NO_x$ and VOC and nonattainment new source review and offset provisions apply.

**B.      *LDEQ Cannot Exempt Woodside Landfill From Meeting Required Protections Based on an Application Made 7 Years Ago.***

LDEQ refuses to subject Woodside Landfill to Nonattainment New Source Review even though it is now issuing Waste Management a "***preconstruction** permit*" and a "Title V Regular Permit ***Initial***." *See* Permit, Cover letter and Emission Rates for TAP/HAP & Other Pollutants. Yet, LDEQ relies on a "$NO_x$ increases" exemption for applications deemed administratively complete prior to December 20, 2001 to claim that does not have to perform Nonattainment New Source Review. *See* Resp. to Pub. Comments at 6.

First, Woodside Landfill is a major source for both $NO_x$ and VOC. A NOx increases exemption cannot excuse nonattainment new source review for VOC. Second, LDEQ already acted on Waste Management's December 20, 2001 application when it issued Waste Management an illegal air permit on December 17, 2004. Indeed, LDEQ's own regulations limit the time LDEQ has to take action on a given permit application. Louisiana regulations require that "final action shall be taken on any application relating to a new facility or to a

---

[11] 42 U.S.C. § 7511a(d)(2) (providing for a more protective offset ratio—1.3 tons of reductions for each 1 ton of new emissions—in severe areas); *see also id* § 7511a(c)(10) (offsets required in serious areas are 1.2 to 1).

substantial permit modification... within 410 days of receipt of the permit application." La Admin. Code tit. 33 pt. III § 519.C.4.

The application at issue here is the application Waste Management submitted to LDEQ on October 19, 2007. Waste Management both claims that it is an application for a permit revision, but that it was "resubmitting [its] initial permit application." *See* Waste Management Permit Application, Oct, 19, 2007, cover letter and executive summary, EDMS Doc # 36354673. The March 2001 application is stale and does not meet the requirements for a complete permit application under § 519.D. of Louisiana's air regulations. The facility for which Waste Management is seeking a permit now differs vastly from the one they sought a permit for in 2001. Waste Management is now seeking a permit for a landfill that emits pollutants from a flare and from bioremediation and is nearly double the size Waste Management was seeking a permit for back in 2001.

LDEQ is now issuing a preconstruction permit and initial operating permit to a landfill. It cannot refuse to enforce Clean Air Act protections in place now by pointing to the law that applied seven years ago. For example, Louisiana law requires that:

> "As a condition for issuing a permit to construct a major stationary source ... in a nonattainment area, the public record must contain an analysis, provided by the applicant, of alternate sites, sizes, production processes, and environmental control techniques and demonstrate that the benefits of locating the source in a nonattainment area significantly outweigh the environmental and social costs imposed."

La. Admin. Code tit. 33, pt III § 504.D.7. LDEQ is issuing Waste Management a preconstruction permit for a major stationary source in a nonattainment area. Yet the public record is devoid of any showing of how the benefits of locating the landfill in a nonattainment area significantly outweigh the environmental and social costs imposed.

14

LDEQ must perform nonattainment new source review for ozone precursors NOx and VOC before it can legally issue a preconstruction and initial Part 70 Operating Permit for Woodside Landfill.

III.   EPA SHOULD OBJECT TO THE PERMIT BECAUSE LDEQ FAILED TO PROVIDE PUBLIC NOTICE AND OPPORTUNITY TO COMMENT ON THE PRECONSTRUCTION AND INITIAL PART 70 OPERATING PERMIT.

LDEQ never publicly noticed or accepted public comment on the preconstruction and initial part 70 operating permit it issued on December 5, 2008. Instead, LDEQ publicly noticed a permit minor modification for an existing permit and held a public hearing on the modification in March 25, 2008. But before LDEQ modified the existing permit, the Louisiana courts vacated the existing air permit. Therefore, LDEQ could not act on the application before it—an application to modify an existing permit—because that permit no longer existed. LDEQ needed to review Waste Management's application to ensure it contained all necessary information for a preconstruction and initial operating permit, revise the draft permit to reflect that the permit it previously issued had been vacated by Louisiana courts, and re-notice the revised draft permit for public comment to reflect that the proposed permit was now a preconstruction and initial operating permit instead of a permit revision.

According to Louisiana regulations, "public notice shall be published by the permitting authority prior to the issuance of any permit which is the initial permit issued in accordance with a federally approved operating permit program...." La. Admin. Code tit. 33 pt. III § 531.A.2.a. The public notice must identify "the activities involved in the permit action..." along with "copies of the proposed permit [and] the application...." *Id.* § 531.A.2.b; *see also* 40 C.F.R. §70.7(h)(2).

The public was notified that Waste Management was seeking a revision to an existing permit, not a preconstruction and initial Part 70 Operating Permit. The public notice reads: "the company requested *revision* to the Part 70 Air Operating Permit for Woodside Landfill and Recycling Center (WLRC)." *See* Public Notice (emphasis added), attached as Exhibit C. Likewise, the proposed permit with the public notice was a revision to an existing permit, not a preconstruction and initial operating permit. The air permit briefing sheet provided along with the public notice states: "A permit application and Emission Inventory Questionnaire dated October 19, 2007, were submitted by Waste Management of Louisiana, LLC requesting a *revision* of Part 70 operating permit." Air Permit Briefing Sheet at 1 (emphasis added), attached as Exhibit D.

After the public was provided an opportunity to comment on a proposed revision to an existing permit, the Louisiana courts vacated the existing air permit. The public must be afforded an opportunity to comment on an initial permit, and they must be afforded an opportunity to comment on the significantly changed conditions at the landfill—namely, the fact that the court vacated the air permit.

## CONCLUSION

For the foregoing reasons, Petitioners ask that EPA object to the preconstruction and initial Part 70 Air Operating Permit (No. 1740-00025-V1) for Woodside Landfill.

Respectfully submitted on January 2, 2009,

Jill M. Witkowski, Deputy Director
TULANE ENVIRONMENTAL LAW CLINIC
6329 Freret Street
New Orleans, Louisiana 70118
Phone (504) 865-8814
Fax (504) 862-8721
*On behalf of Louisiana Environmental Action*
*Network, Concerned Citizens of Livingston Parish,*
*Mr. O'Neil Couvillion and Mr. Harold Wayne*
*Breaud*

I hereby certify that I have this 2nd day of January, 2009, served a copy of this Petition to those listed below.

Jill M. Witkowski

Stephen Johnson, Administrator
U.S. EPA Headquarters
Ariel Rios Bldg.
1200 Pennsylvania. Ave., NW
Mail Code 1101A
Washington, D.C. 20460

Mr. Jeffery Robinson
Chief, Air Permits Section (6PD-R)
U.S. EPA, Region 6
1445 Ross Avenue, Suite 1200
Dallas, Texas 75202-2733

Harold Leggett, Ph.D.
Secretary
LDEQ
602 N. Fifth Street
Baton Rouge, LA 70802

C T Corporation System
Lisa Uttech,
Registered Agent for Waste Management
5615 Corporate Boulevard, Suite 400B
Baton Rouge, LA 70808

Mr. Bryan D. Johnston
Administrator
LDEQ, Air Permits Division
P.O. Box 4313
Baton Rouge, LA 70821-4313

Anne J. Crochet, Esq.
Counsel for Waste Management
P.O. Box 2471
Baton Rouge, LA 70821

17